WRIGHT, FINLAY & ZAK, LLP
Ramir M. Hernandez, Esq.
Nevada Bar No. 13146
8337 W. Sunset Rd., Suite 220
Las Vegas, NV 89113
(702) 475-7964; Fax: (702) 946-1345
rhernandez@wrightlegal.net

STONE HILTON PLLC
Judd E. Stone II*
Texas Bar No. 24076720
Christopher D. Hilton*
Texas Bar No. 24087727
Cody C. Coll*
Texas Bar No. 24116214
600 Congress Ave., Suite 2350
Austin, TX 78701
Telephone: (737) 465-3897
judd@stonehilton.com
chris@stonehilton.com
cody@stonehilton.com

* Pro hac vice forthcoming

*Attorney for Plaintiff, Duncan Ross*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| DUNCAN ROSS,<br><br>    Plaintiff,<br><br>v.<br><br>TRANG NGUYEN,<br><br>    Defendant. | Case No.:<br><br>**PLAINTIFF'S ORIGINAL COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1.    Some people make; some people take. Plaintiff Duncan Ross is an experienced technical officer and early-stage investor who martials his considerable experience working for tech-heavy companies, such as Nintendo and Sony, along with his extensive consulting experience

to create and accelerate projects to market. Ross attempted to partner with Defendant Trang Nguyen to develop and market a tool to act as an artificial-intelligence co-founder for future start-ups—software that could help would-be founders to develop their business ideas and transform them into working ventures. That attempt failed not because Ross's idea proved undesirable by the market, but because it proved too desirable for Nguyen, who appropriated Ross's work for her unilateral benefit and who went to great lengths to sully Ross's good name along the way. Ross brings this suit to vindicate both his name and his idea, and to prevent Trang Nguyen from wrongfully benefiting from her misappropriation of Ross's property, intellectual and otherwise.

## PARTIES

2.      Plaintiff Duncan Ross is an individual citizen of the United Kingdom domiciled in the United Kingdom.

3.      Defendant Trang Nguyen is an individual citizen of the United States domiciled in Reno, Nevada.

## JURISDICTION & VENUE

4.      This Court has subject-matter jurisdiction over this case because Plaintiff is a citizen of a foreign state, the United Kingdom; Defendant is a citizen of a State, Nevada; and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a)(2).

5.      This Court likewise has general personal jurisdiction over Defendant, as she both is a domiciliary of and resides within both this District and Division—on information and belief, in Reno, Nevada. She has remained both a domiciliary of and resident in this District and Division during all points relevant to this suit, and can therefore be fairly described as "at home" here for purposes of this Court's exercise of personal jurisdiction.

6. Venue is proper in this district for the same reasons that this Court possesses personal jurisdiction: Defendant resides here. 28 U.S.C. § 1391(b)(1).

## GENERAL ALLEGATIONS

7. Plaintiff has long worked in the venture capital and technology ecosystems. Across his 20 years' experience, he's built hundreds of products. For example, Plaintiff served as the head of research and development for Nintendo and had a substantial role in developing the wildly successful Nintendo Wii gaming console. At another time in his career, Plaintiff designed and oversaw the development of a global wind energy business and ecosystem for industry titan Shell plc. Plaintiff has also worked on groundbreaking projects in the software and gaming world, such as developing the first 3D game engine for the Grand Theft Auto franchise.

8. Venture capital is a small world, in which most managers, analysts, and investors know—or know of—one another. Unsurprisingly, then, venture capital is intensely based on relationships, credibility, and perception. Rumors can break relationships, blow up deals, and end careers. Indeed, a venture capital manager's relationships and credibility can be more important than past performance when raising funds, proposing a project, or recruiting talent.

9. During his career, Plaintiff has demonstrated leadership in Fortune 500 companies, international conglomerates, and tech firms. He has served in senior technical officer positions in companies such as Nintendo and Sony, and he has consulted for a diverse array of interests such as Shell plc and Chelsea Football Club. He has worked with capital funds, large and small. And, since early 2022, Plaintiff works with start-up companies as a founder and Chief Technology Officer of an "accelerator" called Soonami.io.

10. Through his education and experience, Plaintiff has expertise in aerospace engineering, oil and gas operations, computer science and software development, and, of course,

business disciplines such as wealth management, corporate finance and capital operations, product development and project management, and marketing and public relations. Plaintiff's educational background includes a Bachelor of Science with honors in computer science and management from the University of Glasgow, a Master of Science in games technology from Glasgow Caledonian University, and a Ph.D. in aerospace engineering and cryptography, also from the University of Glasgow.

11.    Plaintiff has also gained substantial experience and expertise in crypto, blockchain, and web3 technologies. One of Plaintiff's crypto projects generated a substantial exit in 2016 worth more than $100mm in total. Web3 and blockchain technologies are poised to transform—and are already reshaping—the business and venture capital worlds by shifting governance, contribution, and share ownership towards a decentralized model that enables a democratized and borderless digital landscape benefiting markets and protecting individual freedom. Soonami and Plaintiff leverage these technologies and their team's vast digital experience to support burgeoning founders from ideation to launch of new products and services in the internet age.

12.    Defendant, by comparison, has spent her entire career in capital management; she has never built a product of her own.

13.    In 2022 when Plaintiff was founding Soonami, Defendant was the General Partner of a capital fund called Transpose Platform, which backs "frontier founders and the funds that accelerate them."[1] Transpose invested in Soonami early on, so Plaintiff and Defendant were acquainted with one another and interacted on a few occasions over the next few years.

---

[1] https://www.transposeplatform.vc/ (last accessed June 26, 2026).

14.    In October 2024, unbeknownst to Plaintiff, Defendant was ousted from Transpose and soon pivoted to freelance work, so she was looking for projects and employment. She and Soonami's CEO discussed the possibility of her running and promoting Soonami in the Americas, as it is a Europe-based organization. So Defendant became more involved with Soonami over the next few months; she came to some meetings, but she never fully understood what Soonami was trying to do or the business model.

15.    Meanwhile, leveraging his substantial technical expertise and venture-capital knowledge, Plaintiff devised and began producing an artificial-intelligence-driven cofounder tool that could deploy to advise and assist would-be founders in developing business ideas and getting those businesses functional. The tool was envisioned to validate product or service ideas, build pitch decks, run financial projections, and even manage day-to-day operations, complete bookkeeping tasks, create marketing materials, and more. In short, the tool would equip founders to go from idea to first investment without elite networks, top-tier degrees, or family wealth by providing precise, accurate, human-like answers to the most important questions and road-blocks founders encounter.

16.    The key differentiating feature of the project was based on Plaintiff's research on advanced AI reasoning, and the project would go beyond what any then-existing large language model (LLM) or other AI tool could accomplish. "AI reasoning" describes the ability of the tool to simulate a human-like cognitive process using logic, knowledge, and information to make an informed and reasonable decision. For example, if you told an LLM that you wanted to launch a business selling hats for birds, the LLM might say "that's a great idea; there are millions of birds, and nobody is selling them hats." Plaintiff's tool, on the other hand, would have the logic skills to know that selling hats to birds is nonsensical.

17.    Before the zenith of the current AI and LLM boom—launched by OpenAI's release of ChatGPT, Plaintiff previously wrote a whitepaper in 2023 titled "Future of startups: Can AI run a company?" That whitepaper was posted to arXiv, "a free distribution service and open-access archive" for scholarly articles that usually hosts papers that are being prepared for peer review and later publication. The paper described Plaintiff's work on AI reasoning and his concept for an AI business partner.

18.    In early 2025, Plaintiff was working to develop and implement the AI cofounder tool. He began discussing the project with Defendant in late March, with the idea that the two could collaborate and raise funds for the project. Defendant quickly became aware that Plaintiff had a prototype of the tool and was curious to see it in action. She also learned that Plaintiff had published previous research on AI reasoning and that Plaintiff had the infrastructure, AI agent, and compute power established for his demo product. By the end of the month, the two had collaborated to update a narrative and a pitch deck that Plaintiff had previously created, and they had agreed to raise traditional capital (rather than pursue tokenized funding) through Plaintiff's research and development entity.

19.    By early April, Plaintiff and Defendant had agreed to be co-CEOs of the new venture, and that Defendant would focus on partnerships and fundraising, rather than on technical development, an area outside her skillset. As April progressed, Plaintiff and Defendant agreed on a go-to-market strategy, had several calls with promising potential investors, and started recruiting a potential CTO, a Ph.D. AI developer. They also settled on a name for the project, "NovaMindAI," which was Plaintiff's idea and suggestion.

20.    NovaMindAI was designed to leverage advanced reasoning, the subject of Plaintiff's past research, and multi-agentic architecture to process structured, factual data as well as contextual, qualitative data.

21.    The two were excited to work together and for the project, especially to serve the "underserved founders" of the world. Both came from less privileged backgrounds and worked to make their own careers, and so were eager to provide a valuable service to others less connected and privileged.

22.    Toward the end of April, however, the co-CEOs started to diverge. They had differing opinions about how best to produce a prototype and about when and how to raise funds. Plaintiff wanted to raise a small investment and hire a designer to help produce a more robust and polished product on which to raise further capital. Defendant, on the other hand, wanted to produce something quick and present to bigger investors sooner to raise more funds faster.

23.    But Defendant did not understand the product development that needed to occur before any demonstrations could take place. She seemed to believe that a "lookalike" or minimally functional prototype could simply be thrown together, so Plaintiff tried to explain that even a less-than-complete demo version would require substantial back- and front-end engineering that simply could not be done for free.

24.    Despite these differences, Plaintiff and Defendant had a successful call with a fund called AGI House in late April. AGI House claims to "advance[] frontier AI from breakthrough to mass adoption." It's a fund, accelerator, incubator, and lab that says, "by bringing together AI researchers and founders to reshape society with AI-native infrastructure and applications, we're building an AGI-powered future." AGI House would have been a natural fit for NovaMindAI, and

Defendant had a history with its leadership and insights that could have led to a valuable partnership.

25.    Around the end of April, Defendant vanished; Plaintiff did not hear from her for several weeks. Plaintiff believed that Defendant was continuing to make connections for the burgeoning project and instill interest amongst potential investors.

26.    In late May, Defendant made contact again. But it seemed that Defendant was not interested in working with Plaintiff; progress on NovaMindAI had slowed to a crawl, and the pair continued to diverge in their opinions. For example, Defendant started to express concern about the potential CTO Plaintiff had proposed they retain to assist with the project.

27.    Then Defendant disappeared again. In late June, Plaintiff realized that Defendant had launched her own AI venture called simply "Novi" that, per her marketing materials, "use[d] advanced reasoning, market signals, and competitive mapping." Boldly, Defendant began posting on LinkedIn about her project around that time, saying, for example, that Novi could "Validate your ideas before diving in — leverage real market signals, competitive insights, and intelligent analysis."

28.    When Plaintiff confronted Defendant about her venture, Defendant acted as though Novi was completely different from NovaMindAI and pointed out that NovaMindAI didn't have an advanced prototype because the two did not agree on how to bring on and compensate the additional technical talent required to bring the project to fruition.

29.    But Novi is patently the same product as NovaMindAI. Novi's tagline at the top of its website is "Decide what's worth building. Before you write code. Before you quit your job. Before you waste six months." Novi claims to summarize meetings and generate tasks. And it boasts that it can "[r]un a structured analysis to understand market size, buyer urgency,

monetization paths that actually work, key risks and constraints, and why similar ideas failed or won."

30.    Defendant kept posting on LinkedIn about Novi. For example, she described a supposed conversation with an investor who said, "Novi is replacing all analysts and associates." Defendant's post then said, "As entrepreneurs, our brain just doesn't stop—new ideas every day. Novi is the best way I've found to rapidly validate them and surface investor-grade insights— instantly."

31.    It soon became clear to Plaintiff that Defendant had blatantly stolen his idea, betrayed his trust as a partner, and worked with a different technical founder to wrongfully cut Plaintiff out of the business and the value that rightfully belonged to him. Defendant took Plaintiff's idea to and recruited Khaled Hussein to build the product because she knew that he could bootstrap the company from his own capital. Thus, Defendant eliminated the need for an early cash infusion that Plaintiff had been pushing for so that he could hire the talent required to produce an effective prototype.

32.    Mr. Hussein is a computer scientist, serial entrepreneur, and capable investor. He co-founded a company called "Tilt" through the famous startup accelerator Y Combinator, which has launched the likes of Airbnb, DoorDash, Reddit, and Stripe. Tilt was itself acquired by Airbnb in 2017, but only after achieving a peak valuation of around $375 million. Since 2017, Mr. Hussein has launched various other startups and has operated a "venture studio" to "incubate" ideas into offshoot projects. Over the years Mr. Hussein has received funding from various sources, including Transpose, which is how Defendant and Mr. Hussein came to know one another. Given this background, Mr. Hussein's ability to self-fund, and Defendant's history working with him, Mr.

Hussein was a no-brainer when Defendant was seeking a replacement co-founder to help launch the idea she stole from Plaintiff.

33.    In late September, after Defendant reached out, Plaintiff informed Defendant that he had retained counsel and that all communication should go through counsel.

34.    Plaintiff later learned that Defendant was spreading false rumors about Plaintiff and intentionally damaging his credibility throughout summer 2025. That fall, it started to get back to Plaintiff; he heard from many people in the venture capital ecosystem that Defendant had said Plaintiff's tech was unreliable, that his background was insufficient to be a trusted parter, that he was not a credible founder or businessperson, and, bizarrely, that he was having an affair with a financial analyst or possibly with his personal assistant. Of course, Plaintiff was not having an affair and does not have a personal assistant in any event.

35.    Defendant was spreading these lies in in-person conversations, but also via written communication. For example, in September 2025, she messaged Soonami's CEO (Plaintiff's co-founder in that company) that Plaintiff never contributed to the NovaMindAI pitch materials, that he was incapable of producing a prototype (on her timeline), that he lacked integrity, and that he was a "do nothing" but wanted "to get compensated for doing nothing."

36.    A few weeks later Defendant messaged the Soonami CEO again to say that Plaintiff is "someone you wouldn't want on your cap[italization] table, team, advisor or board," and that "everyone in the VC and startup [community] will look poorly at the whole situation and by extension [S]oonami."

37.    Defendant's defamatory conduct continued until February 15, 2026, when it culminated in an email she sent to over 60 individuals, many of whom were invested in or otherwise related to Soonami, and others of whom were in Plaintiff's wider network of colleagues,

investors, and industry friends. That email was nothing short of an attempted social and economic assassination of Plaintiff:

> **Datum:** Sonntag, 15. Februar 2026 um 19:58
> **An:** vietfatale@proton.me <vietfatale@proton.me>, tvietgnuyen4@gmail.com <tvietgnuyen4@gmail.com>
> **Betreff:** Urgent Concern Regarding Your Soonami Investment
>
> Soonami Investors,
>
> I am writing to alert you to what I believe is a critical risk regarding your investment in Soonami. Based on multiple credible sources—including concerns raised independently by experienced investors—there is a significant possibility that this investment could result in a total loss.
>
> To help you evaluate these warnings, I want to share my direct experience with the company. I initially joined Soonami as an advisor and later served as CEO of the US operations. I was also a co-founder of Novi, where I played an active role in building the company from the ground up. It was during this time that I discovered Duncan Ross was falsely presenting himself as a co-founder of the ai builder, Novi—a claim that fundamentally misrepresents his actual involvement and contributions.
>
> Beyond this misrepresentation, I have serious concerns about Duncan's character and credibility. He engaged in an inappropriate relationship with an assistant, and his behavior raises questions about his judgment. He lacks technical expertise and, in my assessment, does not possess the qualities necessary to serve as an effective founder. These issues, combined with the independent red flags raised by other investors, suggest that Soonami's leadership and legitimacy warrant careful scrutiny.
>
> Given the stakes involved, I felt obligated to share what I know. Please feel free to reach out if you would like to discuss this further.
>
> Trang Nguyen

38.    Worst of all, Defendant's attempted social and economic assassination has been partially successful. Plaintiff has suffered the loss of specific economic opportunities because of her defamatory statements.

39.    For example, in March 2025, Defendant introduced Plaintiff to a company called SBI Group who was keen to invest in Soonami's management company. SBI Group was lined up

to invest $6mm as of July 2025 but they stopped responding to Plaintiff and disappeared. Plaintiff later learned that SBI Group had been told that Soonami was a "scam" and that its "leadership are not to be trusted." On information and belief, Defendant was the source of those defamatory statements.

40. The same thing happened on almost the same timeline with regard to two other companies; one called Headline Capital Asia and one called Blue Opal Capital. Defendant introduced Plaintiff to those entities, and each was prepared to invest a substantial sum in Soonami. Like SBI Group, Headline Capital Asia and Blue Opal Capital cut off communication with Plaintiff and Soonami in the late summer of 2025. On information and belief, Defendant defamed Plaintiff to Headline Capital Asia and Blue Opal Capital and thereby caused them to abandon their intent to invest.

41. Similarly, in April 2025, Defendant introduced Plaintiff and other Soonami executives to Infinity Ventures. Soonami and Infinity Ventures collaborated on an event the latter was putting on in Tokyo, and Soonami introduced Infinity Ventures to Soonami's portfolio of startups. There was strong momentum toward a collaborative and productive partnership, with the potential for cross-investment and potential for deal flow from Soonami's ecosystem into Infinity Ventures' fund.

42. That all ended, once again, in the late summer of 2025. Plaintiff later found out that Defendant told Infinity Ventures personnel that Soonami is "an unreliable partner with a questionable background."

43. Finally, Plaintiff and a fellow Soonami executive, Christian Sauer, have been in the process of raising a substantial fund, with a goal of $75mm. Immediately after Defendant's defamatory February 2026 email screed, a large number of potential limited partners completely

disengaged from the project and from Plaintiff in particular. Those entities include KfW Capital, CDP Venture Capital, PGGM, and Molten Ventures. At least one of those prospective limited partners reported that it would be "rather safe than sorry." On information and belief, Defendant defamed Plaintiff to each of these would-be limited partners and thereby caused them to reconsider their relationships with Plaintiff and their decision to invest in his fund.

44.     The lost funding to Soonami and to Plaintiff and Sauer's fund total in the tens of millions of dollars.

45.     All attempts to resolve these matters have failed, and Plaintiff has therefore been forced to retain counsel to preserve his rights and to pursue legal and equitable remedies.

## FIRST CAUSE OF ACTION

### Theft of Trade Secrets

46.     All the foregoing paragraphs are incorporated herein.

47.     The elements of theft of trade secrets are "(1) a valuable trade secret; (2) misappropriation of the trade secret through use, disclosure, or nondisclosure of use of the trade secret; and (3) the requirement that the misappropriation be wrongful because it was made in breach of an express or implied contract or by a party with a duty not to disclose." *Kaldi v. Farmers Ins. Exch.*, 21 P.3d 16, 23 (Nev. 2001) (quoting *Frantz v. Johnson*, 999 P.2d 351, 358 (Nev. 2000)).

48.     Here, a valuable trade secret existed in the idea for an AI co-founder with advanced AI reasoning. Furthermore, the materials Plaintiff and Defendant drafted in furtherance of the idea, including pitch deck slides, go-to-market strategies, marketing materials, and other materials also constituted valuable trade secrets.

49.     Defendant misappropriated those trade secrets and used them to create her own business to the exclusion of Plaintiff.

50.     Defendant's misappropriation was wrongful in that it violated duties owed to Plaintiff and to the parties' implied partnership and that misappropriation damaged plaintiff as further discussed below and incorporated here.

51.     Defendant's misappropriation was willful in that her actions were intentional and deliberate, rather than accidental or inadvertent, *see Robey v. State*, 611 P.2d 209, 210 (Nev. 1980), and malicious in that her actions were calculated to injure Plaintiff and were driven by an evil intent to harm Plaintiff and to cause him economic loss, *State v. Second Judicial Dist. Court in & for Cnty. of Washoe*, 462 P.3d 671, 674–75 (Nev. 2020).

## SECOND CAUSE OF ACTION

### Breach of Implied Partnership and of Fiduciary Duty

52.     All the foregoing paragraphs are incorporated herein.

53.     "A claim for breach of fiduciary duty customarily has three elements: (1) existence of a fiduciary duty, (2) breach of the duty, and (3) damages as a result of the breach." *Guzman v. Johnson*, 483 P.3d 531, 538 (Nev. 2021).

54.     "[A] partnership is an association of two or more persons to carry on as co-owners a business for profit . . . ." *Moroni Corp. Inves. Int'l, Inc. v. Edgemon*, 381 P.3d 643 (Nev. 2012) (alterations in original) (quoting Nev. Rev. Stat. § 87.060(1)); Nev. Rev. Stat. § 87.4322(1).

55.     Partners owe each other and the partnership the duties of loyalty and care. Nev. Rev. Stat. § 87.4336(1).

56.     The duty of loyalty includes the obligation "[t]o account to the partnership and hold as trustee for it any property, profit or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity," and the obligation "[t]o refrain from

Page 14 of 19

competing with the partnership in the conduct of the partnership business before the dissolution of the partnership." Nev. Rev. Stat. § 87.4336(2).

57. The duty of care imposes the obligation "to refrain[] from engaging in grossly negligent or reckless conduct, intentional misconduct or a knowing violation of law." Nev. Rev. Stat. § 87.4336(3).

58. In addition, partners must "discharge the duties to the partnership and the other partners . . . and exercise any rights consistently with the obligation of good faith and fair dealing." Nev. Rev. Stat. § 87.4336(4).

59. What's more, "[a] partner may use or possess partnership property only on behalf of the partnership." Nev. Rev. Stat. § 87.4333(7).

60. Here, the parties had a partnership in that they explicitly agreed to own a business together that would seek profit by raising funds, producing a product, and either generating income or selling the business for a net gain to the partners. Therefore, Defendant owed Plaintiff and the partnership the duties of loyalty and of care, and she was obligated to act in good faith and fairly in her dealings with Plaintiff and the partnership.

61. When she misappropriated trade secrets constituting partnership property and used that trade secret information for her own benefit outside the partnership and to the partnership's detriment, Defendant breached the duties of loyalty, care, and good faith and fair dealing. By that action Defendant further violated Nevada Revised Statute section 87.4333(7).

62. Plaintiff was harmed by Defendant's breach of fiduciary duties and breach of the partnership in that she misappropriated valuable trade secret information such that the partnership could no longer profit from that trade secret information and was rendered worthless.

63.    Plaintiff has a right to sue for Defendant's breaches under Nevada Revised Statute section 87.4337(2).

### THIRD CAUSE OF ACTION

### Defamation

64.    All the foregoing paragraphs are incorporated herein.

65.    "In general, an action for any type of defamation requires the plaintiff to prove four elements: (1) a false and defamatory statement; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." *Nigam v. Ahmad*, 561 P.3d 597 (Table), 2024 WL 5181837, at *5 (Nev. App. 2024) (citing *Clark Cnty. Sch. Dist. v. Virtual Educ. Software, Inc.*, 213 P.3d 496, 503 (Nev. 2009)).

66.    If the defamatory statement "imputes a 'person's lack of fitness for trade, business, or profession,' or tends to injure the plaintiff in his or her business, it is deemed libel per se and damages are presumed." *Id.* (quoting *K-Mart Corp. v. Washington*, 866 P.2d 272, 282 (Nev. 1993)).

67.    Defendant made numerous oral false statements of fact regarding Plaintiff's fitness for his profession and that injured Plaintiff in his business. Defendant also made such statements in an email that was distributed to various investors, potential investors, and professional colleagues of Plaintiff's.

68.    Defendant made those oral and written statements knowing they were false or with reckless disregard for the truth or, at the very least, with negligence.

69.    Defendant's defamatory publications were libelous per se, entitling Plaintiff to at least nominal damages. Defendant's defamatory publications also caused Plaintiff actual damages.

## FOURTH CAUSE OF ACTION

### Tortious Interference with Prospective Economic Advantage

70.     All the foregoing paragraphs are incorporated herein.

71.     The elements of wrongful interference with prospective economic advantage are "(1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct." *In re Amerco Derivative Litig.*, 252 P.3d 681, 702 (Nev. 2011) (quoting *Wichinsky v. Mosa*, 847 P.2d 727, 729–30 (Nev. 1993)).

72.     Defendant's wrongful and tortious conduct—namely her repeated defamation of Plaintiff—has caused specific prospective contractual relationships to fall apart.

73.     Defendant knew of the prospective relationships Plaintiff had with those third parties, as described above. On some occasions she introduced Plaintiff to those third parties. And, regardless, Defendant is a player in the tight-knit venture capital space and is generally aware of burgeoning partnerships in the space. Defendant defamed Plaintiff without privilege or justification.

74.     Defendant specifically intended to harm Plaintiff's economic interests by defaming him and thereby interfering with his prospective economic advantages and prospective contractual relationships.

75.     Defendant's interference with Plaintiff's prospective contractual relationships has caused Plaintiff to suffer tens of millions of dollars of lost funding and a commensurate degree of actual damages.

**EXEMPLARY DAMAGES**

76.     Because Defendant subjected Plaintiff "to cruel and unjust hardship with conscious disregard of the rights of [Plaintiff]," Nev. Rev. Stat. § 42.001(4), and because Defendant "intended to injure [Plaintiff]" and engaged in "despicable conduct . . . with a conscious disregard of the rights or safety of [Plaintiff]," *id.* § 42.001(3), Plaintiff is entitled to exemplary damages "for the sake of example and by way of punishing" Defendant, *id.* § 42.005(1).

**ATTORNEYS FEES**

77.     Plaintiff has retained the undersigned counsel to prosecute this action. Because Defendant willfully and maliciously misappropriated the partnership's trade secret information, the Court should award Plaintiff reasonable attorneys' fees. Nev. Rev. Stat. § 600A.060.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment in his favor and the following relief:

a.  Actual and economic damages in an amount to be proved at trial, but no less than $50,000,000;

b.  Exemplary damages;

c.  Plaintiff's costs as provided by law;

d.  Pre- and post-judgment interest as provided by law;

e.  Reasonable and necessary attorneys' fees as provided by law; and

f.  For all such other and further relief allowed by law and equity as is just and proper.

DATED this 29th day of June, 2026

Respectfully submitted,

*/s/ Ramir M. Hernandez*
Ramir M. Hernandez, Esq.
Nevada Bar No. 13146
**WRIGHT, FINLAY & ZAK, LLP**

8337 W. Sunset Rd., Suite 220
Las Vegas, NV, 89113
Telephone: (702) 475-7964
Fax: (702) 946-1345
rhernandez@wrightlegal.net

Judd E. Stone II*
Texas Bar No. 24076720
Christopher D. Hilton*
Texas Bar No. 24087727
Cody C. Coll*
Texas Bar No. 24116214
**STONE HILTON PLLC**
600 Congress Ave., Suite 2350
Austin, TX 78701
Telephone: (737) 465-3897
judd@stonehilton.com
chris@stonehilton.com
cody@stonehilton.com

*\* Pro hac vice forthcoming*

*Counsel for Plaintiff*